**PUBLISH**

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**June 3, 2021**

**Christopher M. Wolpert**
**Clerk of Court**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**
_____

GERALD OHLSEN; JANET
YOUNGBERG; JAMES FARRINGTON;
THOMAS (TONY) DEROCHIE; CARYN
DEROCHIE; WILLIAM MCCLELLAN;
DONNA MCCLELLAN; NANCY
HIGGINS; VERNON COBB; BINDA
COBB; CHRISTINE WOOD; MARK
THOMPSON; DONALD GILES;
BONNIE LONG; THOMAS BRAGG;
DIANE BRAGG; ERNEST VIGIL;
FRIEDA VIGIL; BRAD WOSICK;
JOHNNY LUNA; DEANNE LUNA;
MARLENE BARBER; MICHAEL
MCDANIEL; PAULA WILTGEN;
MARTIN VALENCIA; VESTED
INTEREST, LLC; JANICE
FARRINGTON; KEN KUGLER; DEBBIE
KUGLER; DAVID LEE; DIANE LEE;
JOSEPH LEE; ALICA LEE; ED
MORTENSEN; KATHERINE
MORTENSEN; DAVID COULTER;
MATT URBAN; MARIE URBAN;
OLYMPIA SALAS; MARY ANN SOLIS;
RENA SHEPHERD; BRETT MYRICK;
KAREN HERRERA; MICHAEL
MEDWIN; MICHAEL CHAVEZ;
MICHELLE CHAVEZ; RONALD
DOUGLASS; MANUEL URBAN, JR.;
ANTHONY FARRINGTON,

     Plaintiffs - Appellants,

and

CATHERINE C. DE BACA; DAVID
LLOYD SAIS; LUCILLE SAIS; TOMAS

Nos. 19-2124, 19-2129,
19-2130, 19-2163

APODACA; CHRISTINE APODACA; JEFF SORROCHE,

Plaintiffs - Appellants,

and

STATE FARM FIRE & CASUALTY COMPANY; SAFECO INSURANCE COMPANY OF AMERICA; ALLSTATE INSURANCE COMPANY,

Plaintiffs - Appellants,

and

ERNEST R. GREENE,

Plaintiff - Appellant,

v.

UNITED STATES OF AMERICA; DOES 1-10,

Defendants - Appellees.

_____

**Appeals from the United States District Court
for the District of New Mexico
(D.C. Nos. 1:18-CV-00096-JB-KK, 1:17-CV-01161-JB-KK,
1:18-CV-00367-JB-KK, 1:19-CV-00237-JB-KK, 1:18-CV-00496-JB-KK)**

_____

Tom Tosdal of Tosdal Law Firm, Solana Beach, California (Jane B. Yohalem of Law Office of Jane B. Yohalem, Santa Fe, New Mexico, on the briefs), for Plaintiffs-Appellants.

Joshua Y. Dos Santos, Assistant United States Attorney (Joseph H. Hunt, Assistant Attorney General; John C. Anderson, United States Attorney; Roberto D. Ortega, Assistant United States Attorney; Ruth F. Keegan, Assistant United States Attorney; Cassandra C. Currie, Assistant United States Attorney; Christopher F. Jeu, Assistant United States Attorney; Mark B. Stern, Attorney, Appellate Staff Civil Division; Joshua

2

Revesz, Attorney, Appellate Staff Civil Division, on the brief), Washington, D.C., for Defendants-Appellees.

_____

Before **PHILLIPS**, Circuit Judge, **LUCERO**, Senior Circuit Judge, and **CARSON**, Circuit Judge.

_____

**PHILLIPS**, Circuit Judge.

_____

In the summer of 2016, a large fire, later known as the Dog Head Fire, engulfed Isleta Pueblo and United States Forest Service land in the Manzano Mountains of New Mexico. By the time it was extinguished, the fire had burned several thousand acres of land. The fire resulted from forest-thinning work performed by Pueblo crewmembers under an agreement with the Forest Service. The partnership to thin the forest arose after numerous fires had beset the surrounding areas.

Insurance companies and several owners of destroyed property (collectively, "Appellants") sued the government, alleging negligence under the Federal Tort Claims Act ("FTCA"). Their negligence claims fell into two categories: the government's own negligence arising from acts of Forest Service employees, and the government's negligence arising from acts of the Pueblo crewmembers. The government moved to dismiss, arguing that the court lacked jurisdiction and, alternatively, for summary judgment on that same basis. The district court granted the government summary judgment. First, the court concluded that the Pueblo crewmembers had acted as independent contractors of the government, and thus, the government wasn't subject to FTCA liability based on the Pueblo crewmembers'

3

negligence. Additionally, the court barred these claims under the FTCA's administrative-exhaustion requirement. Second, the court barred Appellants' claims premised on the Forest Service employees' own negligence, under the FTCA's discretionary-function exception.

On appeal, Appellants contend that the district court erred in ruling that the FTCA jurisdictionally barred their claims. We disagree. Exercising jurisdiction under 28 U.S.C. § 1291, we affirm.

## BACKGROUND

### I. Factual Background

#### A. The Agreement

In 2014, the United States Forest Service entered into a cooperative agreement (the "Participating Agreement" or "Agreement") with the Isleta Pueblo, a federally recognized Indian tribe in New Mexico. The Agreement arose under the authority of the Cooperative Funds and Deposits Act ("CFDA"), 16 U.S.C. § 565a-1 (1975). The Agreement sought to accomplish the objectives of the Isleta Tribal Forest Protection Act Project, namely, to "improve forest health, restore the area to more natural conditions, and improve wildlife habitat" by "cutting and masticating trees." Appellants' App. vol. 3 at 542. After discussing treatment plans for the area, the parties entered into a contract, which included documents prescribing the requirements for thinning and masticating the forest.

The Agreement covered land in the Manzano Mountains of New Mexico—an area adjacent to Forest Service land that had recently suffered from several large-

4

scale fires. The land was divided into three geographic regions, with each region being broken down into different treatment units.

Under the Agreement, the Pueblo had several responsibilities relating to on-the-ground thinning operations. For example, the Pueblo was required to "[c]ontribute personnel" and "manage the employees so that work [was] completed as mutually agreed upon." *Id.* at 543. The Pueblo was also responsible for "establish[ing] and maintain[ing] a complete Quality Control Plan," *id.* at 562, and for "perform[ing] work to the Quality Assurance Requirements," *id.* at 561. Further, the Pueblo was responsible for training Pueblo employees, volunteers, and other program participants in safety and the use of equipment. Of particular relevance here, the Agreement established that no Pueblo "employees, volunteers, [or] program participants" were to be deemed Federal employees "for any purposes," including the FTCA. *Id.* at 546. Rather, the Pueblo "agree[d] to assume [those] responsibilities." *Id.*

In turn, the Forest Service agreed to "reimburse the Pueblo for the U.S. Forest Service's share of actual expenses incurred"; "[d]esignate work areas and provide cutting guidelines for achieving desired condition[s]"; and "[i]nspect the work to provide feedback on how goals [were] being accomplished." *Id*. at 543–44.

The Agreement also detailed the way that thinning and mastication would occur. For instance, the Forest Service set completion deadlines for the Pueblo to finish each project. From this, the Pueblo could schedule its start and end dates for each project, so long as the crew started work within ten days of receiving notice

5

from the Forest Service to proceed. The Forest Service also managed the Pueblo crewmembers' schedule through its required daily quotas for thinning, slashing, and masticating.

In regard to cutting the trees, Forest Service employees flagged or painted the boundary areas of each treatment site so that the crewmembers would know where to work, sometimes even marking individual trees for the Pueblo to remove. Though the Pueblo had discretion in selecting which other trees to cut, the crew was required to follow the Forest Service's detailed directives. These included leaving "approximately 75-80 trees per acre in a randomly distributed pattern," keeping all trees with a trunk diameter at breast height greater than sixteen inches, and maintaining the same composite percentage of the tree varieties. *Id*. at 551–52. After cutting the trees, the crews were to "lop and scatter" the limbs and the tops of the fallen trees—creating what is known in the industry as "slash." *Id.* at 551.[1] Because significant amounts of slash can create a fire hazard, the Agreement prohibited the Pueblo from allowing the slash to pile higher than eighteen inches. Ultimately, the Pueblo was responsible for "monitor[ing] the performance of the agreement activities to ensure that performance goals [were] being achieved." *Id.* vol. 1 at 124.

---

[1] Slash refers to the discarded vegetation left over from the thinning and mastication process. *See* Appellants' App. vol. 3 at 688 (describing slash as "vegetative material including . . . cull logs, blasted or pushed-out stumps, chunks, broken tops, limbs, branches, rotten wood, [or] damaged brush . . . which is created or disturbed as a result of Partner's operations, including construction of temporary roads and landings, or other improvements under this agreement").

Typically, the Forest Service's Project Administrator, Aaron Johnson, met twice weekly with the Pueblo's Project Contact, Frank Jiron, to discuss where in the forest to work as well as the progress and quality of the work. Johnson or the Forest Service's independent inspector—Francisco Lueras—would sometimes deem the Pueblo crewmembers' work as unacceptable. In these cases, the Pueblo crew would rework the units.

Johnson stated that he was responsible for "ensur[ing] that the specifications in the partnership agreement were met by the on-site cooperators." *Id.* vol. 2 at 333. As the Pueblo Contact, Jiron was on-site about seventy-five percent of the time, markedly more than Johnson, whom Pueblo crewmembers "[r]arely" saw. *Id.* vol. 3 at 723. Johnson did state that he visited the units "many" times, but he primarily communicated with Jiron, who then communicated with the rest of the Pueblo crew. *Id.* vol. 1 at 156.

Regarding safety, the Pueblo was to "prepare and submit a safety plan to provide for worker and public safety." *Id.* vol. 3 at 562. The Pueblo was responsible for supplying the crews with emergency equipment, including fire extinguishers and water-filled tanks. In the event of a fire, the Pueblo was to close areas of the forest and restrict thinning operations as required by the Agreement's Fire Precaution Schedule. And under the Agreement, the Pueblo acknowledged that it "may be held liable for all damages and for all costs incurred by the Government for labor, subsistence, equipment, supplies, and transportation deemed necessary to control or

7

suppress a fire set or caused by the [Pueblo] or the [Pueblo]'s agents or employees."
*Id.* at 703.

### B.     Unit 4 and the Fire

The Agreement was in effect in the summer of 2016 when the Dog Head Fire began. The fire started in Unit 4 of the project, an area considered a "high priority treatment area" because it created an important firebreak[2] between Forest Service and Pueblo lands. *Id.* vol. 1 at 198. Accordingly, there was a sense of urgency in completing the treatment there. Originally, the Agreement instructed the Pueblo crewmembers to leave the Unit 4 slash on the ground for the public to collect as firewood. But by 2015, the public hadn't gathered the slash at the expected rate. So the Forest Service had to consider alternatives to address it. After ruling out two options—(1) burning the material or (2) letting it naturally decay—as harmful to wildlife and vegetation, the Forest Service settled on masticating it.

By masticating the material, the Forest Service "redistribute[d] the slash into variable sizes to decrease the risk of wildfire." *Id.* at 199. In 2014, during Johnson's last inspection of Unit 4 before the fire, he noted that the unit complied with the eighteen-inch maximum slash limit. Yet by 2016, when the fire started, the slash had accumulated beyond the 2014 and 2015 levels. By 2016, the slash in Unit 4 was "waist high," *id.* vol. 2 at 353, and had become "very dry" because it had "cured for a long time," *id.* at 510.

---

[2] A firebreak is a gap in debris or vegetation that creates a barrier to slow or stop the spread of wildfire.

June 14, 2016 was a hot summer day. The weather presented a "high potential for fire growth." *Id.* vol. 5 at 1272. Still, when Pueblo crewmembers went to masticate Unit 4 that day, there were no fire restrictions in place, and the water trucks were parked at the ranger station about an hour from the site. While one crewmember worked with the masticator, two other crewmembers stood about 600 yards away near their service truck. The truck contained a shovel and an axe, but no water. No Forest Service employees were in Unit 4 at that time.

The fire started after the masticator struck a rock, caused a spark, and ignited the surrounding brush.[3] When the masticator operator first noticed the fire, it was within a four-foot square, but he thought he couldn't safely extinguish it. So he instead radioed his supervisor for help. The fire raged for about three months, burning 17,912 acres and destroying twelve residences and forty-four other structures.

## II.    Procedural Background

In accordance with the FTCA, 28 U.S.C. §§ 1346, 2671–2680, Appellants filed administrative claims with the United States Department of Agriculture, alleging that the government had acted negligently in its conduct leading up to the Dog Head

---

[3] Forest Service employees later investigated the fire's cause and saw that several of the metal teeth on the masticator—necessary to grind the trees and the slash—were chipped.

Fire.[4] *See id.* § 2675(a). After the Agency rejected their administrative claims, Appellants sued the government in the United States District Court of New Mexico. In their Complaints, Appellants alleged two categories of government negligence. First, they alleged that the government was liable based on the Forest Service employees' negligence in failing to properly supervise the Pueblo crewmembers and in making other decisions that worsened the fire. For instance, they alleged that the Forest Service had negligently allowed slash to accumulate and that it had failed to require fire equipment near the mastication site or to implement fire restrictions. Second, Appellants asserted government liability based on the Pueblo crewmembers' negligence in failing to maintain the proper slash depth, failing to have fire equipment near the masticator, and failing to implement a fire-safety plan. Notably, Appellants didn't sue the Pueblo directly.[5]

---

[4] Several individual plaintiffs to this suit filed administrative claims, three of which alleged as follows: "As a result of negligent operation of equipment, and/or negligence in commencing fire suppression activity, the Dog[] Head Fire commenced and spread." *E.g.*, Appellants' App. vol. 2 at 287. They also attached a government report and a media report to their administrative claims, which outlined a high-level overview of the events in question. Another plaintiff provided a more in-depth administrative claim, but only generally referred to negligence arising from a failure to supervise.

[5] Bringing suit against the Pueblo presents challenges of its own because the Pueblo is a sovereign nation. *See Kiowa Tribe of Okla. v. Mfg. Techs., Inc.*, 523 U.S. 751, 754 (1998) ("As a matter of federal law, an Indian tribe is subject to suit only where Congress has authorized the suit or the tribe has waived its immunity." (citations omitted)).

The government filed a motion to dismiss and for summary judgment on grounds that the FTCA provided no jurisdiction for the claims. It argued that two FTCA exceptions barred the claims against the government based on the Pueblo crewmembers' negligence: (1) the independent-contractor exception, and (2) the administrative-exhaustion requirement. Similarly, the government argued that the FTCA's discretionary-function exception barred the claims against the government based on the Forest Service's own negligence. Therefore, it argued that the district court lacked subject-matter jurisdiction under the FTCA to hear the Complaints' claims.

In a comprehensive order, the district court agreed.[6] The court noted that the FTCA applies only to the negligence of federal employees—not of independent contractors. On that point, the court concluded that the Pueblo crewmembers had acted as independent contractors of the Forest Service. To start, the court ruled that the CFDA, by itself, didn't transform the Pueblo crew into federal employees for purposes of governmental tort liability. With that in mind, the court applied the factors in *Lilly v. Fieldstone*, 876 F.2d 857 (10th Cir. 1989), to evaluate whether the Pueblo crewmembers had acted as government employees or independent contractors. The court focused on the first factor, the parties' intent. There, the court examined the parties' highly detailed Agreement and their conduct under that

---

[6] The district court converted the government's claims relating to the independent-contractor exception and the discretionary-function exception from a motion to dismiss to a motion for summary judgment. The parties don't dispute this conversion so we consider our analysis under the framework of summary judgment.

11

Agreement, including the Forest Service's lack of daily supervision. After doing so, the court concluded that the Pueblo crewmembers had acted as independent contractors. In the alternative, the court concluded that Appellants' claims based on the Pueblo crewmembers' negligence would have been administratively barred for failing to meet the FTCA's notice requirement. *See* 28 U.S.C. § 2675(a).

Finally, the court concluded that the discretionary-function exception to the FTCA barred the claims against the government based on the Forest Service employees' own negligence in allegedly failing to supervise the Pueblo and in failing to make proper fire-suppression decisions. The court determined that because the Forest Service had discretion in deciding whether to "delegate the responsibility of complying with the maximum slash depth" and whether to prevent and suppress fires, the government couldn't be held liable. Appellants' App. vol. 7 at 1764. It also determined that the FTCA excepted liability for all of the Complaints' claims and granted the government's motion.

## DISCUSSION

Appellants argue that the district court mistakenly concluded that it lacked jurisdiction under the FTCA and erred in three of its conclusions: (1) that the Pueblo crewmembers were independent contractors; (2) that the discretionary-function exception barred the claims in the Complaint based on the Forest Service employees' own alleged negligence; and (3) that Appellants failed to administratively exhaust their claims against the government relating to the Pueblo's negligence.

12

We review de novo the district court's grant of summary judgment, applying the same standard as the district court. *Gross v. Hale-Halsell Co.*, 554 F.3d 870, 875 (10th Cir. 2009) (citation omitted). In doing so, "we examine the record and all reasonable inferences that might be drawn from it in the light most favorable to the non-moving party." *Id.* (citation and brackets omitted). To prevail on summary judgment, a movant must show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Our duty is "not [] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Birch v. Polaris Indus., Inc.*, 812 F.3d 1238, 1251 (10th Cir. 2015) (alteration in original) (citation omitted).

## I. FTCA Standard

Under the FTCA, Congress granted a "limited waiver of sovereign immunity" by "making the Federal Government liable to the same extent as a private party for certain torts of federal employees." *United States v. Orleans*, 425 U.S. 807, 813 (1976). Liability may arise for injuries

> caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b)(1).

But the FTCA carves out several important exceptions. And "[w]hen an exception applies, sovereign immunity remains, and federal courts lack jurisdiction." *Garling v. U.S. Env't Prot. Agency*, 849 F.3d 1289, 1294 (10th Cir. 2017) (citations

13

omitted). First, the FTCA imposes liability only when a federal employee is negligent. 28 U.S.C. § 1346(b)(1). A federal employee includes "officers or employees of any federal agency" but excludes "any contractor with the United States." *Id.* § 2671. Put another way, the government can't be liable under the FTCA for the negligence of its independent contractors. *See id.* § 1346(b)(1). Second, the FTCA is inapplicable to discretionary acts. *Id.* § 2680(a). Under this exception, the government avoids liability for "[a]ny claim based upon . . . the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." *Id.* Third, the FTCA's exhaustion requirement mandates that a claimant must "first present[] the claim to the appropriate Federal agency" before bringing an action in court. *Id.* § 2675(a).

Before beginning our analysis, we note three guiding principles: (1) that a "waiver of sovereign immunity must be strictly construed, in terms of its scope, in favor of the sovereign," *Sossamon v. Texas*, 563 U.S. 277, 292 (2011) (internal quotation marks and citation omitted); (2) that "[e]xceptions to the FTCA are to be narrowly construed," *Miller v. United States*, 710 F.2d 656, 662 (10th Cir. 1983) (citations omitted); and (3) that the party suing the government bears the burden to prove a waiver of sovereign immunity, *James v. United States*, 970 F.2d 750, 753 (10th Cir. 1992) (citation omitted).

Appellants urge us to conclude that the FTCA exceptions don't apply to their claims and that the government has waived its sovereign immunity. We cannot do so.

14

## II.    Administrative Exhaustion

Before suing, Appellants filed administrative claims with the United States Department of Agriculture. *See* 28 U.S.C. § 2675(a). To sue under the FTCA, an administrative claim must first "be denied by the agency either in writing or by failure to make a final disposition within six months of filing." *Lurch v. United States*, 719 F.2d 333, 335 n.3 (10th Cir. 1983) (citation omitted). Here, the Agency effectively denied Appellants' administrative claims by failing to make a final disposition within six months.

After the Agency rejected their administrative claims, Appellants filed suit in federal district court. The court disallowed all the Complaints' claims against the government based on the Pueblo's negligence, concluding that Appellants had failed to properly exhaust their administrative remedies. *See* 28 U.S.C. § 2675(a). Notwithstanding Appellants' assertion of their administrative claims with the Agency, the district court determined that they had nonetheless failed to adequately notify the government that their claims hinged on the Pueblo's negligence. *See id.* Appellants' challenge this conclusion on appeal.

Though we note that courts interpret the administrative requirement flexibly, *see Estate of Trentadue ex rel. Aguilar v. United States*, 397 F.3d 840, 853 (10th Cir. 2005) (citation omitted), we needn't reach this issue because we conclude that the FTCA's independent-contractor exception otherwise bars those claims against the government premised on the Pueblo crewmembers' negligence.

15

## III.  The Independent-Contractor Exception

Because "the FTCA does not authorize suits based on the acts of independent contractors or their employees," *Tsosie v. United States*, 452 F.3d 1161, 1163 (10th Cir. 2006) (citation omitted), we must determine whether the Pueblo crewmembers acted as independent contractors for the Forest Service, or instead as federal employees. We conclude that they acted as independent contractors for three reasons. First, we reject Appellants' position that the CFDA itself establishes that the Pueblo crewmembers are federal employees for purposes of the FTCA. Second, despite Appellants' contrary argument that the CFDA changes our traditional analysis, we apply our circuit's *Lilly* test to resolve this question. Third, after applying the *Lilly* factors, we agree with the district court that the Pueblo crewmembers were independent contractors. Accordingly, we conclude that the FTCA's independent-contractor exception bars Appellants' claims against the government based on the Pueblo crewmembers' alleged negligence.

### A.  Employment Status Under the CFDA

Appellants argue that an agreement under the CFDA allowing the Forest Service to supervise the work of a cooperator (here, the Pueblo) necessarily requires a finding that the cooperator's employees are federal employees for purposes of the FTCA's waiver of immunity. As mentioned, the district court rejected Appellants' interpretation of the CFDA. Instead, in applying the *Lilly* factors and considering the Agreement and the parties' conduct under the Agreement, the court concluded that

16

the Pueblo crewmembers had acted as the Forest Service's independent contractors. We agree.

We begin by recognizing that the CFDA allows the Secretary of Agriculture to enter into cooperative agreements with "public or private agencies, organizations, institutions, or persons." 16 U.S.C. § 565a-1. This statute further allows the Forest Service to contract with cooperators to "perform forestry protection, including fire protection, timber stand improvement, debris removal, and thinning of trees." *Id.* Notably, the CFDA provides that "cooperators and their employees may perform cooperative work under supervision of the Forest Service in emergencies or otherwise as mutually agreed to, but shall not be deemed to be Federal employees other than for the purposes of [the FTCA] and [the Federal Employees Compensation Act]." *Id.* § 565a-2.

Appellants interpret this language to *require* that cooperators supervised by the Forest Service be considered federal employees under the FTCA. In their words, "when the parties agree that the cooperative work will be done 'under the supervision of the Forest Service,' the cooperator and its employees *will be deemed to be federal employees* for purposes of coverage under the FTCA." Appellants' Opening Br. at 25 (emphasis added). We disagree.

In interpreting a statute, we seek to "ascertain the congressional intent and give effect to the legislative will." *Ribas v. Mukasey*, 545 F.3d 922, 929 (10th Cir. 2008) (citation omitted). In doing so, we use "traditional tools of statutory construction." *United States v. Manning*, 526 F.3d 611, 614 (10th Cir. 2008) (citation

17

omitted). We begin with the statute's plain language, *In re Taylor*, 899 F.3d 1126, 1129 (10th Cir. 2018) (citation omitted), because "[i]t is a well established law of statutory construction that, absent ambiguity or irrational result, the literal language of a statute controls," *Edwards v. Valdez*, 789 F.2d 1477, 1481 (10th Cir. 1986) (citation omitted).

Here, we encounter an issue of first impression. The parties have cited no cases, and we have found none, analyzing what effect the CFDA has on the question whether cooperators are federal employees under the FTCA. We conclude that the CFDA simply permits the government and cooperators to agree that the cooperators' employees shall be deemed federal employees under the FTCA, but it doesn't mandate it. In other words, though the CFDA *excludes* cooperators from ever being deemed federal employees outside of the FTCA and the Federal Employees Compensation Act, it doesn't automatically *include* cooperators as federal employees in either instance. The district court put it this way: "Although the CFDA contemplates cooperative agreements that provide for Forest Service supervision, . . . [this] does not shed light on the Forest Service's and Isleta Pueblo's intents." Appellants' App. vol. 7 at 1707–08 (internal citation omitted).

We conclude that Congress didn't intend to displace the traditional analysis for distinguishing employees from independent contractors in the realm of cooperative agreements. Indeed, the "Tort Claims Act was never intended, and has not been construed by this Court, to reach employees or agents of all federally funded programs that confer benefits on people." *Orleans*, 425 U.S. at 813. We read the

18

statute's plain language as saying that parties to Agreements under the CFDA can negotiate independent-contractor status. *See Manning*, 526 F.3d at 614 ("If the statutory language is clear, our analysis ordinarily ends." (citations omitted)).

## B. The Traditional *Lilly* Test Applies

Thus, we turn our attention to whether the parties agreed that the Pueblo crews were federal employees for purposes of the FTCA. The parties dispute what test governs this issue. Appellants contend that the Pueblo's status as a cooperator under the CFDA bears on the analysis. They argue that the standard from *Logue v. United States*, 412 U.S. 521 (1973) controls, disassociating it from *Lilly* and its seven factors. Appellants point out that *Logue*'s supervision or control test was in force in 1975 when the CFDA was enacted. In deciding the employee-versus-independent-contractor question, *Logue* relied on the common-law rule, which considers whether the employer has the right to control the details of the other's work. *Logue*, 412 U.S. at 531 ("[W]e are not persuaded that employees of a contractor with the Government, whose physical performance is not subject to governmental supervision, are to be treated as [federal employees].") Appellants argue that this test is more in line with the "supervision" language in the CFDA than is *Lilly*'s seven-factor test.

On the other hand, the government argues that the Pueblo's status as a cooperator under the CFDA makes no difference because, either way, the traditional employment test applies. The government contends that the *Lilly* test expounds on the *Logue* test and applies here.

19

In *Lilly*, our court was fully aware of *Logue* and its concern for who "control[s] the detailed physical performance of the contractor." *Lilly*, 876 F.2d at 858 (quoting *Logue*, 412 U.S. at 528). Addressing that concern, *Lilly* outlines seven factors to use in that determination. *Id.* at 859 (citation omitted). Two important factors now at issue are (1) the parties' intent and (2) whether the government controls the end result only, or whether it also controls the "manner and method of reaching the result." *Id.* (citation omitted).

We apply *Lilly*, which in turn implements *Logue*.[7] We reject Appellants' view that the two cases present rival tests—one in *Logue* for determining the employment status of cooperators under the CFDA and one in *Lilly* for determining employment status in other circumstances. *See* Appellants' Opening Br. at 26 ("Replacing the clear language of the CFDA, which refers solely to supervision by the Forest Service, with the list of seven *Lilly* factors is inconsistent with the plain language of the statute and with Congressional intent."). *Lilly* enforces *Logue*. *See Lilly*, 876 F.2d at 858 (citing *Logue* favorably). Indeed, this court has noted that "[w]e have searched without success among the numerous state and federal cases . . . to find interpretive authority more helpful than *Lurch* and [*Lilly*] in the light of *Orleans* and *Logue*." *Bird v. United States*, 949 F.2d 1079, 1084 (10th Cir. 1991).

---

[7] To the extent that Appellants ask us to overrule *Lilly* as having misapplied *Logue*, their argument must fail at this stage of review. "We are bound by the precedent of prior panels absent en banc reconsideration or a superseding contrary decision by the Supreme Court." *In re Smith*, 10 F.3d 723, 724 (10th Cir. 1993) (per curiam) (citations omitted).

20

### C.    The *Lilly* Factors

In distinguishing between employees and independent contractors, we consider the government's ability "to control the detailed physical performance of the contractor." *Logue*, 412 U.S. at 528 (citations omitted). The key inquiry is "whether the Government supervises the day-to-day operations of the individual." *Lilly*, 876 F.2d at 858 (quoting *Lurch*, 719 F.2d at 337).[8] We consider seven factors:

> (1) [T]he intent of the parties; (2) whether the United States controls only the end result or may also control the manner and method of reaching the result; (3) whether the person uses her own equipment or that of the United States; (4) who provides liability insurance; (5) who pays social security tax; (6) whether federal regulations prohibit federal employees from performing such contracts; and (7) whether the individual has authority to subcontract to others.

*Id.* at 859 (citation omitted).

#### 1.    The Parties' Intent

First, we consider the parties' intent. An agreement and the parties' performance under that agreement ordinarily manifest the parties' intent. We have previously found that parties intended an independent-contractor relationship when their contract "expressly stipulated" that certain medical personnel "shall not be considered . . . employees for any purpose." *Lurch*, 719 F.2d at 338 (citation

---

[8] *See* 1 *Civil Actions Against the United States, Its Agencies, Officers and Employees* § 2:18 (2021) ("The key inquiry under this test is whether the government supervises the day-to-day operations of the individual worker. When a supervisory authority has no detailed control, on the other hand, the worker is considered to be an independent contractor." (footnotes omitted)).

21

omitted). "Because of that contract . . . and the working arrangement under it," we concluded that the independent contractor exception applied. *Id.*

Here, the language of the Agreement is equally clear: "The Pueblo agree(s) that any of their employees, volunteers, and program participants *shall not be deemed to be Federal employees* for any purposes including Chapter 171 of Title 28, United States Code (Federal Torts Claim Act)." Appellants' App. vol. 3 at 546 (emphasis added). And we have ruled that "[w]here there is a contract between the government and the [plaintiff], clear language regarding government control or 'federal employee' status can often prevail over facts that might otherwise support a finding of 'day-to-day control.'" *Woodruff v. Covington*, 389 F.3d 1117, 1127 (10th Cir. 2004). The provision here evinces a strong intent that the Pueblo crewmembers acted as independent contractors. *See Tsosie*, 452 F.3d at 1164 (determining the parties' intent based in part on their agreement that a doctor render his services "in his capacity *as an independent contractor*").

Other provisions in the Agreement are consistent with the parties' expressed intent. For example, the Agreement required the Pueblo to manage and train its crews, and it required that the Forest Service inspect the results of that work. In addition, the Agreement describes the Pueblo as a contractor. *See, e.g.*, Appellants' App. vol. 1 at 142 (stating that if the crew's performance failed to meet the agreed upon standards, the area would be "[r]ework[ed] at *contractor's* expense" (emphasis

22

added)).[9] Thus, the district court had ample basis to conclude that the parties intended an independent-contractor relationship. Therefore, we conclude that the first *Lilly* factor indicates an independent-contractor relationship.

### 2. The Government's Control

The second *Lilly* factor also supports the Pueblo crewmembers' status as independent contractors. Under this factor, we consider whether the government controls the end result only, or whether it controls "the manner and method of reaching the result." *Lilly*, 876 F.2d at 859 (citation omitted). Primarily, we consider "whether the Government supervise[d] the day-to-day operations" of the Pueblo. *Lurch*, 719 F.2d at 337 (citation omitted). The record establishes that it did not.

Appellants contend that the detailed Agreement establishes the government's right to control the details of the Pueblo crewmembers' work, in turn establishing an employer-employee relationship. Yet "detailed regulations and inspections are not in and of themselves evidence of an employer-employee relationship." *Curry*, 97 F.3d at 415 (citation omitted); *see also* 1 *Civil Actions Against the United States, Its Agencies, Officers and Employees* § 2:18 (2021) ("The government may exercise control over factors assuring contract compliance or safety without exercising the day-to-day supervision which would make the contractor a government

---

[9] Though the Agreement also refers to "employees," we read it as referring to the Pueblo's employees, not the Forest Service's. *See, e.g.*, Appellants' App. vol. 1 at 125 (stating that an executive order banned texting and driving among "Federal employees," but that "cooperators, their employees, volunteers, and contractors" were encouraged to adopt this policy as well).

23

employee . . . . Thus, the federal government may reserve the right to inspect an independent contractor's work without assuming control of day-to-day operations." (footnotes omitted)). Indeed, in some instances, a detailed contract points the other way. *See Norton v. Murphy*, 661 F.2d 882, 884 (10th Cir. 1981) ("[T]he very length and detail of the contract . . . suggests, to us, an independent contractor relationship between the parties. To us it is doubtful that a master-servant relationship, where the master tells the servant what to do and when to do it, would require a contract of the type here involved.").

Previously, we have concluded that an individual was an independent contractor for the Forest Service despite a "detailed contract" describing "exactly what the job entailed" and precise specifications outlining the requirements for performance. *Curry*, 97 F.3d at 413. In *Curry*, for example, we concluded that the Forest Service had acted only as a "general supervisory authority" by monitoring his job performance without telling him "how or when to do his work" or "whom to hire or how to operate his equipment." *Id.* at 414.

So too here. Surely the government exercised control over the results of the Pueblo's thinning work by requiring the Pueblo to meet daily quotas, establishing starting and ending times for the Pueblo's work, specifying the size and types of trees to be cut, and marking specific trees for removal. But even taken together, this control doesn't result in an employer-employee relationship, particularly when balanced against the control retained by the Pueblo to "manage," "supervise," and "direct the work of its employees, volunteers, and [other program] participants,"

24

Appellants' App. vol. 3 at 543, 546, as well as its duty to "establish and maintain a complete Quality Control Plan . . . to ensure the requirements of the agreement [were] provided as specified," *id.* at 562.

We acknowledge that Johnson, the Forest Service's main point of contact, met bi-weekly with Jiron, the Pueblo's main point of contact, to discuss the progress and quality of work. But Johnson typically issued orders through Jiron, not directly to the Pueblo crewmembers. In fact, Pueblo crewmembers testified that they "[r]arely" saw Johnson on-site, yet Jiron was on-site about seventy-five percent of the time. *Id.* at 723. And Johnson didn't tell the Pueblo crewmembers "when and where to go and what to do." *Curry*, 97 F.3d at 415 (quoting *United States v. Becker*, 378 F.2d 319, 322–323 (9th Cir. 1967)). Instead, the Forest Service controlled the Pueblo only to the "extent necessary to ensure that the desired results were achieved." *Id.*; *see also Duplan v. Harper*, 188 F.3d 1195, 1201 (10th Cir. 1999) ("[T]he government's ability to require that [contractors] meet minimum qualifications and to conduct reviews of the [contractors'] performance amounts to nothing more than a standard quality assurance [provision] by which the government reserves the right to determine whether it is satisfied with the services it is purchasing under the contract." (fourth alteration in original) (internal quotation marks and citations omitted)).

Nor are we persuaded by Appellants' argument comparing this case to *Patterson & Wilder Construction Co. v. United States*, 226 F.3d 1269 (11th Cir. 2000). There, our sister circuit determined that a group of pilots qualified as federal employees for FTCA purposes when "the Government decided, and instructed the

25

pilots on, virtually every important aspect of the aircraft's intended use," as well as "actively supervised and dictated many if not most of the significant day-to-day activities." *Id.* at 1275. The same cannot equally be said here, where the district court noted that the "evidence is not such that it shows Johnson managing the day-to-day thinning operations—when they begin[], when they end, [and] how the thinning crew masticates." Appellants' App. vol. 7 at 1731. Rather, as in *Curry*, the evidence shows that the Forest Service "supervisors came to the thinning site and directed the thinning crew how to achieve the project's goals." *Id.* (citing *Curry*, 97 F.3d at 415) (footnote omitted). Thus, the second *Lilly* factor also supports an independent-contractor relationship.

### 3. Other *Lilly* Factors

We needn't address the remaining *Lilly* factors. Appellants don't argue them, and they acknowledge that the Pueblo crewmembers are independent contractors if we apply the *Lilly* test.[10] Because Appellants present no argument as to the remaining five factors, we conclude that the first two *Lilly* factors are dispositive. *See Curry*, 97 F.3d at 415 (relying primarily on the parties' contract and the government's control in concluding that an independent-contractor relationship existed). Accordingly, we

---

[10] At oral argument, in response to a panel member's questioning whether "it is appropriate for us to look at the traditional benefits and coverage of the respective governmental programs for employees, such as health insurance, eligibility for federal retirement benefits, or for other benefits that traditional employees of the Forest Service might have," Appellants' counsel responded, "I think not." Oral Argument at 0:55–1:28. Responding to the panel member's further questioning about whether Appellants would "utterly fail on that type of a test," Appellants' counsel answered affirmatively: "[We] would, Your Honor . . . ." *Id.* at 1:45–1:52.

26

determine that "the contractual arrangement itself and its application placed [the Pueblo] outside the parameters of an employer-employee relationship with the Government." *See Lurch*, 719 F.2d at 338 (citation omitted). Therefore, the government can't be liable under the FTCA for the negligence of the Pueblo crewmembers. *See* 28 U.S.C. § 1346(b)(1).

## IV.    The Discretionary-Function Exception

Appellants also pursue FTCA claims against the government based on the Forest Service employees' own alleged negligence in failing to supervise the Pueblo crewmembers' work. They argue that the discretionary-function exception doesn't extend to two categories of Forest Service decisions: (1) its decision to allow slash to accumulate beyond the eighteen-inch limit, and (2) its decisions regarding fire suppression, namely, not to post a fire guard or truck at the mastication site and not to impose fire restrictions on the day of the fire. The district court concluded that all claims against the Forest Service relevant to this appeal were barred under the discretionary-function exception because Appellants had "identified no mandatory requirements governing the Forest Service's actions." Appellants' App. vol. 7 at 1755. We agree.

The discretionary-function exception to the FTCA excludes the government from liability for "[a]ny claim . . . based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused." 28 U.S.C. § 2680(a). Put simply, "if a government official in performing his

27

statutory duties must act without reliance upon a *fixed or readily ascertainable standard*, the decision he makes is discretionary and within the [discretionary-function exception]. Conversely if there is a standard by which his action is measured, it is not within the exception." *Miller*, 710 F.2d at 663 (alteration in original) (citation omitted). The Supreme Court has explained that this exception "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." *United States v. S.A. Empresa de Viacao Aerea Rio Grandense (Varig Airlines)*, 467 U.S. 797, 808 (1984). "This 'discretionary function exception poses a jurisdictional prerequisite to suit, which the plaintiff must ultimately meet as part of his overall burden to establish subject matter jurisdiction.'" *Garcia v. U.S. Air Force*, 533 F.3d 1170, 1175 (10th Cir. 2008) (citation omitted).

To avoid application of this exception, Appellants must satisfy the two-prong test outlined in *Berkovitz v. United States*, 486 U.S. 531 (1988). First, we consider "whether the action is a matter of choice for the acting employee." *Id.* at 536. "The requirement of judgment or choice is not satisfied if a 'federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow,' because 'the employee has no rightful option but to adhere to the directive.'" *United States v. Gaubert*, 499 U.S. 315, 322 (1991) (quoting *Berkovitz*, 486 U.S. at 536).

Second, if we determine that there is a matter of choice or judgment, we must determine "whether that judgment is of the kind that the discretionary function exception was designed to shield." *Berkovitz*, 486 U.S. at 536. This "prevent[s]

28

judicial second-guessing of legislative and administrative decisions grounded in social, economic, and political policy." *Gaubert*, 499 U.S. at 323 (internal quotation marks and citation omitted); *see also Harrell v. United States*, 443 F.3d 1231, 1235–36 (10th Cir. 2006) ("[T]he court must consider whether the nature of the actions taken implicate public policy concerns, or are susceptible to policy analysis." (internal quotation marks and citation omitted)). That is, "we do not inquire into the intent of the government supervisor when making a specific personnel decision, and neither do we ask whether policy analysis is the *actual* reason for the decision in question." *Sydnes v. United States*, 523 F.3d 1179, 1185 (10th Cir. 2008) (internal quotation marks and citations omitted). Both prongs must be met for the exception to apply. *Id.* at 1183. Because Appellants have met neither prong, they have failed to meet their burden.

### A. Slash

Appellants contend that the government had a nondiscretionary obligation to enforce the agreed-on eighteen-inch slash depth limit in Unit 4. They argue that the Forest Service eliminated any discretion concerning a slash-height limit by adopting this policy in the Agreement. After that, Appellants contend that the government couldn't disregard the slash-height limit as a discretionary function, because "a policy choice [was] already made." Appellants' Opening Br. at 47. Once the Forest Service imposed the slash-height limit, Appellants argue, it was committed to inspect the work for compliance.

At the outset, we note that the Agreement imposed a slash limit on the Pueblo—not on the Forest Service. The Agreement states: the "[*Pueblo*] WILL be required to lop and scatter the limbs and tops up to 3 [inch] Diameter tops of felled trees. Maximum slash depth will be 18 [inches]." Appellants' App. vol. 3 at 556 (emphasis added). What's more, the Agreement required the Pueblo to "manage the employees so that work [was] completed as mutually agreed upon to the specifications," *id.* at 543, and to "establish and maintain a complete Quality Control Plan . . . to ensure the requirements of the agreement [were] provided as specified," *id*. at 562. Because of this, any negligence claims arising from the slash height were attributable to the Pueblo—not the Forest Service. And even if the slash height was attributable instead to the Forest Service, the claims would still fail under the FTCA's discretionary-function exception.

Under the first *Berkovitz* prong, the Forest Service's decisions about ensuring compliance with the slash depth was "a matter of choice for the acting employee." *Berkovitz*, 486 U.S. at 536. True, Johnson had inspected Unit 4 for compliance, and the Agreement states that the Forest Service was to "[i]nspect the work to provide feedback on how goals [were] being accomplished." Appellants' App. vol. 3 at 544. But the directive to "inspect" the Pueblo's work was "too general to remove the discretion" from the government's conduct in determining how or when to inspect the Pueblo's work. *Tippett v. United States*, 108 F.3d 1194, 1197 (10th Cir. 1997). Because "[n]o statute, regulation, or policy specifically prescribe[d] a course of action" for the Forest Service to follow in inspecting the Pueblo's work, these

30

decisions were "truly the product of the [Forest] Service's independent judgment." *Johnson v. U.S. Dep't of Interior*, 949 F.2d 332, 337 (10th Cir. 1991); *see also Varig Airlines*, 467 U.S. at 804, 811 (noting that the government can both impose regulations concerning inspections and simultaneously prescribe "the manner in which such inspections should be made" according to its own judgment (citations omitted)). Thus, the Forest Service's "refusal to regulate more closely the daily operations" of the Pueblo "was entirely in its discretion." *Estate of Harshman v. Jackson Hole Mountain Resort Corp.*, 379 F.3d 1161, 1166 (10th Cir. 2004).

Under the second *Berkovitz* prong, decisions about "the amount of government oversight over the daily operations" of an independent contractor's work are a "matter of public policy" because they require "balancing use of federal lands with the appropriate degree of governmental interference in that use." *Id.* (citation omitted). And questioning the government's implementation of an inspection program in the absence of specific directives has been held to unfairly "require the courts to 'second-guess' the political, social, and economic judgments of an agency exercising its regulatory function," which is "precisely [the] sort of judicial intervention in policymaking that the discretionary function exception was designed to prevent." *Varig Airlines*, 467 U.S. at 820. We accordingly determine that the district court rightfully granted summary judgment on the claims asserting the Forest Service's negligence in addressing the slash.

## B.    Fire Suppression

Appellants also contend that the discretionary-function exception doesn't apply to the government's decisions regarding fire suppression. First, Appellants argue that despite mandatory requirements, the government failed to post a fire guard and a water truck at or near the Unit 4 mastication site on the day of the fire. Appellants point to a provision in the Agreement requiring that a fire guard be posted when the Energy Release Component (ERC) level reached eighty-five percent or higher. Yet on the day that the Dog Head Fire began, when Appellants allege that the ERC level was at ninety percent, no guard was posted. Second, they contend that the Forest Service failed to observe its "mandatory obligation to impose fire restrictions when the ERC reaches 90." Appellants' Opening Br. at 48 (citations omitted). Because these claims are rooted in the same operative facts concerning the fire, we consider them together.

Again, we begin by noting that the Agreement imposes a duty on the Pueblo—not the Forest Service—to provide a fire guard. Appellants' App. vol. 3 at 708 ("[The Pueblo] will provide [a] fire guard."). And it was the Pueblo that restricted operations according to the fire precaution schedule in the Agreement. *Id.* at 566 ("[The Pueblo] will restrict operations in accordance with the attached Emergency Fire Precaution Schedule."). Even so, we determine that the discretionary-function exception independently bars the Forest Service's liability.

Under the first *Berkovitz* prong, Appellants can't point to any "specific and mandatory" provisions directing where and when the Forest Service was to park the

trucks or post the guards. *See Franklin Sav. Corp. v. United States*, 180 F.3d 1124, 1131 (10th Cir. 1999). Rather, the Forest Service's fire-safety specialist, Anthony Martinez, testified that the decision of whether to have a fire truck at a mastication site would be left to the "discretion of the operator," "based on life and property and the [associated] risk." Appellants' App. vol. 4 at 880. And even though Appellants suggest the Forest Service was to post a fire guard near a masticator, the Agreement didn't say as much.

Similarly, Appellants rely on Martinez's testimony to assert that there was a mandatory condition to impose fire restrictions when the ERC level hit ninety percent. *Id.* at 884 (stating in deposition testimony that when the ERC level reaches ninety percent, Martinez would "definitely go into [fire] restrictions"). But Martinez didn't state that the ERC alone imposed a mandatory fire restriction; rather, he testified that the decision to impose fire restrictions required considering additional factors such as the "weather[,] . . . the severity of the fire season, fire occurrence, [and] drought." *Id.* at 883; *see also id.* vol. 7 at 1767–68 (district court noting that in considering whether to impose fire restrictions, the Forest Service looks to the temperature, wind speed, ERC, humidity, resources, events, staffing, and impact of closing the forest on others).

The decisions regarding fire safety also satisfy the second *Berkovitz* prong. Decisions about whether and when to distribute limited resources—namely a fire guard or water truck—are informed by policy considerations such as public and firefighter safety, suppression costs, environmental risks, and the availability of

33

resources. *See Varig Airlines*, 467 U.S. at 820 (noting that an agency's decision involved policy considerations when it required balancing goals of safety and "the reality of finite agency resources"); *Marlys Bear Med. v. U.S. ex rel. Sec'y of Dep't of Interior*, 241 F.3d 1208, 1217 (9th Cir. 2001) ("[T]he distribution of limited resources [is] a function that we have long held to be protected under the discretionary function exception." (citations omitted)).

Likewise, by its very nature, deciding whether to impose fire restrictions involves balancing practical considerations of funding and safety as well as concerns of a fire's impact on wildlife, vegetation, and human life. *See Hardscrabble Ranch, L.L.C. v. United States*, 840 F.3d 1216, 1222–23 (10th Cir. 2016) ("The nature of the [Forest Service's] actions in fighting the . . . [f]ire are susceptible to a policy analysis grounded in social, economic, or political concerns." (citation omitted)); *Green v. United States*, 630 F.3d 1245, 1251 (9th Cir. 2011) (acknowledging that decisions about how to fight a fire, attack a fire, and allocate fire suppression resources are decisions grounded in public policy).[11]

Indeed, we needn't find evidence in the record that in this very instance the Forest Service "considered each of the identified policy factors." *Johnson*, 949 F.2d

---

[11] For the first time on appeal, Appellants argue that the Forest Service had already decided to impose fire restrictions even before the fire started, but that it failed to communicate this information quickly enough. This argument is based on Martinez's deposition testimony that the Forest Service had begun gathering information and moving into restrictions before the fire started. Because "[w]e generally do not consider issues raised for the first time on appeal," *United States v. Mora*, 293 F.3d 1213, 1218 (10th Cir. 2002), and we find no compelling reason here to do otherwise, we decline to consider this issue.

at 339. Rather, the "discretionary function exception may apply in the absence of a conscious decision," so long as there was room for the Forest Service to make "independent policy judgments." *Id.*; *see also Kiehn v. United States*, 984 F.2d 1100, 1105 (10th Cir. 1993) ("[W]e will not assume a nonpolicy decision unless the record shows something to the contrary." (citations omitted)). We conclude that the Complaints' claims against the government based on the Forest Service's negligence are barred under the discretionary-function exception.

## CONCLUSION

Because we determine that all of Appellants' claims are jurisdictionally barred under the FTCA, we **AFFIRM** the district court's grant of summary judgment.